HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| FOREST SERVICE EMPLOYEES FOR ENVIRONMENTAL ETHICS,<br><br>Plaintiff,<br>v.<br><br>UNITED STATES FOREST SERVICE,<br><br>Defendant. | CASE NO. C17-5747-RBL<br><br>ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT<br><br>DKT. ##22, 23 |

## INTRODUCTION

THIS MATTER is before the Court on Plaintiff Forest Service Employees for Environmental Ethics' [Dkt. #22] and the United States Forest Service's [Dkt. #23] Cross Motions for Summary Judgment. This suit arose as a result of the Forest Service's decision to grant a special use permit to the United States Navy allowing the Navy to conduct electronic warfare training in the Olympic National Forest. FSEEE challenges this decision on two grounds.

First, FSEEE contends that the Forest Service lacks congressional authorization to grant permits for the purpose of military training. According to FSEEE, use of national forest land is

circumscribed by the purposes set out in the Organic Administration Act of 1897 (Organic Act), the Multiple-Use Sustained-Yield Act of 1960 (MUSYA), and several narrower statutes. *See* 16 U.S.C.A. §§ 475, 528. Because the Navy's electronic warfare training does not fall within any of these purposes, the Forest Service lacked the power to grant the permit. In response, the Forest Service argues that section 551 of the Organic Act grants it broad regulatory power to control the uses of national forest land. *See* 16 U.S.C.A. § 551.

Second, FSEEE argues that the decision to grant a permit to the Navy violates the National Forest Management Act's (NFMA) requirement that all use permits comply with the agency's land management plan. *See* 16 U.S.C.A. § 1604. More specifically, FSEEE points to the Olympic National Forest Land and Resource Management Plan's (Forest Plan) requirements that the relevant use cannot reasonably be accommodated on private land, prioritizes the interests of the general public, and is in harmony with the surrounding landscape. The Forest Service contends that the Court must defer to the agency's interpretation of its own Forest Plan, under which the Forest Service's decision satisfies all requirements.

For the reasons set forth below, FSEEE's Motion for Summary Judgment is DENIED in part and the Forest Service's Motion is GRANTED in part. The Court reserves one issue under the NFMA, as discussed below.

**BACKGROUND**

In simplified terms, "electronic warfare" refers to the use of electromagnetic energy to disrupt or control access to the electromagnetic spectrum, which may be used for such purposes as navigation or communication. AR177874. To conduct training, the Navy must simulate the types of electromagnetic energy that an enemy would generate in order to practice detecting and controlling these systems. AR177875.

1  One way that the Navy does this is through the use of trucks hauling the necessary
2  equipment to emit an electromagnetic signal. AR177871. These trucks are basically Ford F-350s
3  carrying trailers with large antennae. AR177872. To conduct training, the Navy drives these
4  trucks to pre-selected locations and energizes the emitters, after which aircraft fly overhead and
5  try to detect the signals. AR177871. According to the Navy, these trucks are important for
6  electronic warfare training because they challenge aviators by simulating the mobility of an
7  actual enemy. AR177875.

On March 16, 2015, the Navy submitted a revised application to expand the use of mobile emitter trucks in the Olympic National Forest. AR205704-20. During the comment period, FSEEE objected three times. [Compl., Dkt. #1, at ¶¶ 14-16, Ex. 3-5]. However, on July 31, 2017, the Forest Service issued its decision granting a special use permit pursuant to 36 C.F.R. § 251.50, which regulates the Forest Service's permitting process. AR205606.

The permit allows the Navy to park mobile emitter trucks at 11 designated sites alongside logging roads within the national forest. AR205579. On a typical day, three trucks will be present in the national forest at a time. AR205579. Once a truck is parked, Navy personnel set up a safety zone around the truck using warning tape and signage. AR205579. They then begin operations for an average of 12 hours each day, 250 days of the year. AR205579, 205586. All mobile emitter sites are within the Olympic Military Operations Areas, which is airspace designated for Department of Defense training. AR188404.

**DISCUSSION**

A.  **Summary Judgment Standard**

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). A genuine issue of material fact exists where there is sufficient evidence for a reasonable factfinder to find for the nonmoving party. *Anderson*, 477 U.S. at 248. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52. The moving party bears the initial burden of showing that there is no evidence which supports an element essential to the nonmovant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Once the movant has met this burden, the nonmoving party then must show that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250. If the nonmoving party fails to establish the existence of a genuine issue of material fact, "the moving party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323-24. There is no requirement that the moving party negate elements of the non-movant's case. *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990). Once the moving party has met its burden, the non-movant must then produce concrete evidence, without merely relying on allegations in the pleadings, that there remain genuine factual issues. *Anderson*, 477 U.S. 242, 248 (1986).

**B.    Congressional Authorization of Military Training as a Use of National Forest Land**

*1.    Sufficiency of FSEEE's Pleadings to Raise the Congressional Authorization Argument at Summary Judgment*

FSEEE argues that the Forest Service could not grant the Navy a permit to conduct training on national forest land because no congressional statute authorizes such a use. However, the Forest Service counters that FSEEE is procedurally barred from raising this legal theory

because the complaint makes no mention of it. Instead, the Forest Service contends that the complaint states only one claim for relief under the NFMA, and focuses solely on the facts underlying that claim. [Compl., Dkt. #1, at ¶¶ 11-20]. As a result, the Forest Service argues that it was not put on notice of a claim based on congressional authorization.

FSEEE responds that the only fact necessary to support its congressional authorization claim is that the Forest Service issued the Navy a special use permit to carry out training, and this fact was pled. [Compl., Dkt. #1, ¶ 17]. Further, FSEEE argues that the complaint incorporates the FSEEE's objection to the draft decision to grant the permit, which lays out the congressional authorization argument. [Compl., Dkt. #1, at ¶ 16, Ex. 5]. Finally, FSEEE argues that, by invoking jurisdiction under the APA and stating that the Forest Service "violated the NFMA," the complaint implicitly claims that the agency exceeded its authority. [Compl., Dkt. #1, at ¶¶ 6, 20].

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The Ninth Circuit has explained that where "the complaint does not include the necessary factual allegations to state a claim, raising such claim in a summary judgment motion is insufficient to present the claim to the district court." *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1079–80 (9th Cir. 2008). Following this logic, the court held that the plaintiffs failed to adequately present a claim that the NEIS did not consider certain risks when authorizing the use of artificial snow at a ski resort. *Id*.

The Ninth Circuit came to a similar conclusion in *Coleman v. Quaker Oats Co.*, where the plaintiff attempted to raise a disparate impact theory at summary judgment that was not pled in the complaint or raised during discovery. 232 F.3d 1271, 1292 (9th Cir. 2000). The court held that allowing the plaintiff to assert such a new theory would prejudice the defendant by forcing

them to develop entirely new defenses that were not explored through discovery. *Id*.; *see also Smith v. City & Cty. of Honolulu*, 887 F.3d 944, 951–52 (9th Cir. 2018) (relying on *Coleman*).

Here, like *Navajo Nation*, the plaintiff raises a new argument at summary judgment challenging an agency action. The Court determines that the Forest Service was not adequately put on notice of this claim. The complaint's "Factual Background" section focuses on the Navy and Forest Service's failure to conform to the Forest Plan in granting the permit. [Compl., Dkt. #1, at ¶¶ 11-19]. The "Claim for Relief" section likewise states only that the Forest Service violated the NFMA by failing to meet the LRMP's requirements for special-use permits. [Compl., Dkt. #1, at ¶ 20]. Nowhere in the complaint does FSEEE mention congressional authorization or the limited permissible uses of national forest land.

FSEEE's arguments to the contrary are unpersuasive. While it is correct that the complaint likely contains sufficient facts underlying the congressional authorization argument, the legal theory itself was not pled or raised before summary judgment. *See Coleman*, 232 F.3d at 1292 (affirming the district court's refusal to allow the plaintiffs to go forward with a new legal theory at summary judgment). The complaint's mere references to the APA in the "Jurisdiction and Venue" section and the NFMA in the "Claim for Relief" section are insufficient to inform the Forest Service of the specific congressional authorization argument. *See OTR Wheel Eng'g, Inc. v. W. Worldwide Servs., Inc.*, 897 F.3d 1008, 1024 (9th Cir. 2018) (holding that citing section 43 of the Lanham Act, 15 U.S.C. § 1125, was not specific enough to put the defendant on notice of an unregistered trade dress claim).

FSEEE's reference to and attachment of its objection to the Forest Service's draft decision is also insufficient to put the Forest Service on notice. [Compl., Dkt. #1, at ¶ 16, Ex. 5]. Although the objection lays out the congressional authorization argument, FSEEE's choice to

leave that theory out of its complaint may well have led the Forest Service to believe FSEEE had consciously abandoned that argument in its judicial action. *See Navajo Nation*, 535 F.3d at 1080 n.27 ("A party may raise a claim at the administrative proceedings, but forego that claim on judicial review.").

Because the Forest Service was not on notice of FSEEE's congressional authorization theory, the proper course of action would have been for FSEEE to move to amend its complaint before moving for summary judgment. However the Court would likely allow FSEEE to amend its complaint at this stage of litigation, and the parties have fully argued the congressional authorization issue in their briefs. Consequently, the Court will address the merits of the argument below.

2.   *The Merits of FSEEE's Congressional Authorization Argument*

Section 551 of the Organic Act states that the Secretary of Agriculture may "make such rules and regulations and establish such service as will insure the objects of [national forests], namely, to regulate their occupancy and use and preserve [them] from destruction." 16 U.S.C.A. § 551. The Court must decide whether this authority allows the Forest Service to grant special use permits for purposes not specifically identified by Congress.

FSEEE argues that a series of statutes identify the closed universe of purposes for which national forest land may be used. The broadest purposes are laid out in two statutes. Section 475 of the Organic Act states that national forests shall be "controlled and administered" to "improve and protect the forest within the boundaries," to secure "favorable conditions of water flow, and to furnish a continuous supply of timber." 16 U.S.C. § 475. MUSYA expands these to include "outdoor recreation, range, timber, watershed, and wildlife and fish purposes." 16 U.S.C.A. § 528. Several other statutes also provide specific requirements for the establishment of

communication facilities, archaeological exploration, and the construction of vacation buildings, public buildings, and pipelines. *See* 43 U.S.C. §§ 931, 1761; 16 U.S.C. §§ 432, 497; 30 U.S.C. § 185. FSEEE argues that the Forest Service cannot regulate uses beyond these purposes.

For support of its interpretation, FSEEE relies on the canon *expressio unius est exclusio alterius*, which means "when one or more things of a class are expressly mentioned others of the same class are excluded." According to FSEEE, the specific purposes that Congress identified would be meaningless if the Forest Service could grant a permit for any use it deems worthy.

FSEEE points to *Rainsong Co. v. F.E.R.C.*, 106 F.3d 269, 274 (9th Cir. 1997) and *U. S. v. New Mexico*, 438 U.S. 696, 706 (1978) for the proposition that the Forest Service may not decide the purposes of national forest use. In *Rainsong*, the plaintiff challenged the Federal Energy Regulatory Commission's procedures in denying a hydroelectric license. Under § 4(e) of the Federal Power Act, FERC may only grant a license on national forest land when it is not inconsistent with "the purpose for which such reservation was created or acquired." 16 U.S.C. § 797(e). The court held that FERC erred by deferring to the Forest Service's 1990 management plan to determine the purpose for which the forest was created, and should have instead relied on congressional statutes. *Id*. at 274.

In *New Mexico*, the Supreme Court addressed whether the United States had reserved the use of river water for recreation and other purposes when it set aside the Gila National Forest. 438 U.S. at 697-98. The Court applied the "reserved rights doctrine" to determine that water on national forest land may only be impliedly reserved for a purpose under which the national forest could be established. *Id*. at 718. In reaching this conclusion, the Court found that national forests established before MUSYA could be "reserved for only two purposes-'[t]o conserve the water

flows, and to furnish a continuous supply of timber for the people.'" *Id*. at 707, 713 (quoting 30 Cong.Rec. 967 (1897) (Cong. McRae)).

The Forest Service counters that its authority to regulate "occupancy and use" of national forest land explicitly allows it to permit uses unrelated to those identified by Congress. *See* 16 U.S.C.A. § 551; *see also* Chevron U.S.A., Inc. v. NRDC, 467 U.S. 837 (1984). In the alternative, the Forest Service argues that even if the Organic Act is ambiguous, its interpretation of the statute is reasonable. *Chevron*, 467 U.S. at 844. In addition, the Forest Service asserts that the *expressio unius* canon should not be applied where an agency is interpreting a statute it administers. The Forest Service cites to several cases from the D.C. Circuit in support of this proposition. *See, e.g.*, *St. Marks Place Hous. Co. v. U.S. Dep't of Hous. & Urban Dev.*, 610 F.3d 75, 82 (D.C. Cir. 2010) ("[T]he *expressio unius* canon has little force in the context of challenges to an agency's interpretation of a statute.") (internal quotations omitted).

When confronted with an agency's interpretation of a statute it administers, the Ninth Circuit follows the two-step approach from *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *Latino Issues Forum v. U.S. E.P.A.*, 558 F.3d 936, 941 (9th Cir. 2009). According to the first step, the Court must apply the "traditional tools of statutory construction" to determine whether Congress has unambiguously addressed the issue. *Id*. (quoting *Chevron*, 467 U.S. at 843 n. 9). If Congress's intent is clear, it must be given effect. *Id*. at 941-42. However, if Congress has left a gap, step two requires that the court defer to the agency's interpretation unless it is "arbitrary, capricious, or manifestly contrary to the statute." *Id*. at 942 (quoting *Chevron*, 467 U.S. at 844).

In addition, a "court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its

construction follows from the unambiguous terms of the statute." *National Cable & Telecommunications Assn. v. Brand X Internet Services*, 545 U.S. 967, 982 (2005). However, where a judicial interpretation pre-dates *Chevron*, explicit statements regarding ambiguity are not necessary to resolve the question at step one. *United States v. Home Concrete & Supply, LLC*, 566 U.S. 478, 488-89 (2012). Rather, the inquiry is whether the prior decision indicates the court's belief that congress spoke "directly to the question at hand" and thus left "no gap for the agency to fill." *Id*. (quoting *Chevron*, 467 U.S. at 842-43).

Starting with *Chevron*'s first step, the Court finds that the Forest Service's authority to broadly regulate "occupancy and use" unambiguously permits it to grant special use permits for purposes not specifically identified by Congress. 16 U.S.C.A. § 551. According to the text of section 551 of the Organic Act, the Forest Service's authority to determine permissible uses is limited only by its obligation to "insure the objects" of the reservation and "preserve the forests thereon from destruction." *Id*. However, this does not limit the agency to regulating solely for the purpose of forest protection. [Pl.'s Reply, Dkt. # 24, at 4]. Rather, several circuit courts have held that the Forest Service may permit uses it determines will not harm the forest but also do not actively protect it. *See, e.g., McMichael v. United States*. 480 U.S. 572, 582 (9th Cir. 1987) (upholding a prohibition on motorized vehicles in certain areas); *United States v. Hymans*, 463 F.2d 615, 617 (10th Cir. 1972) (upholding a regulation prohibiting skinny dipping and stating that Forest Service regulations need not directly protect the forest); *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1234 (10th Cir. 2011) (collecting cases).

More importantly, the Supreme Court has found that the Forest Service's regulative powers extend beyond those purposes listed in section 475 of the Organic Act. In *U.S. v. Grimaud*, the Court held that the Forest Service's power encompasses requiring a special permit

for grazing. 220 U.S. 506, 523 (1911). In reaching this conclusion, the Court relied on both section 551, which authorizes regulation of "occupancy and use," and section 478, which states that other sections should not "prohibit any person from entering upon such national forests for all proper and lawful purposes." *Id*. at 515; 16 U.S.C.A. §§ 478, 551. The Court explained that to "pasture sheep and cattle on the reservation, at will and without restraint, might interfere seriously with the accomplishment of the purposes for which they were established," but that regulated pasturage "might not be inconsistent" with those purposes. *Grimaud*, 220 U.S. at 516.

As the Court acknowledged in *Grimaud*, the only statutory purposes for national forests in 1911 were protecting forests, controlling water flow, and securing timber supplies. *See id.* at 507 (quoting 16 U.S.C.A. § 475). Nonetheless, based on sections 478 and 551 of the Organic Act, the Court determined that harmonizing additional uses with these purposes was a "matter of administrative detail." *Grimaud*, 220 U.S. at 516. Although the Court did not state that the statute was unambiguous, this is not necessary to satisfy step one for a statute that pre-dates *Chevron* as long as the court found Congress had addressed the issue. *Home Concrete*, 566 U.S. at 488-89. In addition, although MUSYA identifies additional national forest purposes, its language mirrors section 475 and is supplemental to that subchapter. *See* 16 U.S.C.A. § 528; *Home Concrete*, 566 U.S. at 483 (upholding an interpretation of a statute that was reenacted where the "operative language is identical"). Consequently, the interpretation from *Grimaud* controls and the Forest Service has authority to issue permits for purposes not identified by Congress.

Even if the authority granted by the Organic Act was ambiguous, the Court would defer to the Forest Service's reasonable interpretation under step two of *Chevron*. *See* 467 U.S. at 844. While it may be possible to read the purposes identified by Congress as limiting the permissible uses of reservation land, the Forest Service's interpretation that the list does not limit its

authority is also permissible. Indeed, neither section 475 of the Organic Act nor MUSYA state that the list is exhaustive, and section 551 of the Organic Act does not reference the purposes listed in other subchapters as limitations on agency authority. 16 U.S.C.A. §§ 475, 528, 551.

The cases cited by FSEEE fail to convince the Court otherwise. *Rainsong* may be distinguished on several bases. *See* 106 F.3d at 272-74. First, while the statute in *Rainsong* explicitly mandated that FERC consider congressional purposes before granting a license, no statute at issue here makes such a command. *Id*. at 272 (quoting 16 U.S.C. § 797(e)). Second, *Rainsong* involved FERC's interpretation of a statute it did not administer, meaning the court owed the agency no deference. *Id*. at 274. Here, in contrast, the Forest Service is interpreting its own Organic Act and is thus entitled to deference.

*New Mexico* likewise does not support FSEEE's interpretation. There, the Supreme Court addressed how much water the United States could reserve for its own use, rather than leaving it open for state or private uses. *New Mexico*, 438 U.S. at 699-700. However, this involved analyzing the congressional purposes for *establishing* the forest, not administering it. *Id*. (stating that the court must examine the "specific purposes for which the land was reserved"). In fact, the Court emphasized that the few purposes for reserving land were intended to limit the federal government's ability to exclude other private uses. *Id*. at 708.

The Court finds that section 551 of the Organic Act unambiguously grants the Forest Service authority to permit uses of forest land that have not been specifically identified by Congress. As a result, the Forest Service had authority to grant a special use permit to the Navy to conduct its electronic warfare training.

## C. The Special Use Permit's Compliance with Forest Plan Requirements

The Forest Plan authorizes the Forest Service to grant special use permits only where the use "cannot reasonably be accommodated on private land," the "interests and needs of the general public" are prioritized, and the use is "in harmony" with the surrounding landscape. AR022641. FSEEE asserts that the Forest Service's decision to grant a special use permit to the Navy is inconsistent with these requirements from the Forest Plan and thus violates the NFMA.

*1.  Review of NFMA Claims under the APA*

Review of agency decision-making under the NFMA is governed by the APA because the NFMA does not contain a provision for judicial review. *Native Ecosystems Council v. U.S. Forest Serv., an agency of U.S. Dep't of Agric.*, 418 F.3d 953, 960 (9th Cir. 2005). Under the APA, the court's role on summary judgment is not to engage in independent fact finding, but to "determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. Immigration & Naturalization Serv.*, 753 F.2d 766, 769 (9th Cir.1985). An agency decision may only be set aside if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Native Ecosystems*, 418 F.3d at 960.

To determine if an agency decision is arbitrary and capricious, the court must consider "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012). The standard is a "narrow one," but the court must still engage in a "thorough, probing, in-depth review." *Id*. (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977)). The agency must show a "rational connection between the facts found and the

conclusions made." *Id.* (quoting *Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 384 F.3d 1163, 1170 (9th Cir.2004)).

2.  *The Forest Service's Consideration of Private Land*

The Forest Plan requires that special use permits "may be authorized when such use cannot reasonably be accommodated on private land." AR022641. FSEEE contends that the Forest Service failed to consider this requirement when it granted a permit to the Navy. FSEEE argues that the administrative record contains no documents evidencing that the Forest Service considered whether the Navy's electronic warfare training could be conducted on private land. Furthermore, FSEEE argues that the Navy also failed to consider private land in its application for a special use permit application. Even if it did, FSEEE asserts that the Forest Service was not permitted to rely on the Navy's determinations, but instead had to explain how the record's facts support its conclusion.

In opposition, the Forest Service argues that the Navy did consider other locations for its training, and the Forest Service was entitled to adopt these findings. The Forest Service asserts that the Navy considered several Department of Defense locations, AR205704, 177876-77, and reviewed maps to rule out private land, AR205610-16. The Navy determined that these private land locations were unacceptable due to the specific requirements of electronic warfare training. *See* AR177871, 177876, 205705. In addition, the Forest Service references the Navy's policy of ruling out public land before it can acquire an interest with a private entity. AR205704. The Forest Service concluded from all this information that the Navy's use could not reasonably be accommodated on private land. Finally, if the Court were to find a violation, the Forest Service requests an opportunity for further briefing regarding remedies and harmless error.

1       The NFMA requires that "[r]esource plans, permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans." 16 U.S.C. § 1604(i). "[T]he Forest Service's interpretation and implementation of its own forest plan is entitled to substantial deference." *Weldon*, 697 F.3d at 1056. However, a court may not defer to an agency where its interpretation is "plainly inconsistent with the regulation at issue" or "contradicts the regulation's plain language." *Native Ecosystems*, 418 F.3d at 960 (quoting *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1069 (9th Cir.1998); *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994)). In addition, when deciding whether a use complies with a validly enacted plan, the agency may not decide on its own which requirements are relevant or meaningful, but must instead amend the plan itself. *Native Ecosystems*, 418 F.3d at 961.

      Here, the Forest Plan's requirement that the use "cannot reasonably be accommodated on private land" is not onerous. AR022641. However, the Plan's plain language still minimally requires that the Forest Service explain somewhere in the record why private land would not be feasible. Instead of doing this, the Forest Service merely states in the record that "the Navy considered alternatives and determined that the actions cannot be accommodated on private lands." AR205599. If the Navy made such a determination, it is not explained in the record.

      The record does identify several criteria that make locations acceptable for electronic warfare training. These include the existence of maintained roads, preexisting "pull-outs" for the trucks, lack of electronic spectrum interference, different elevations and angles for receiving signals, presence beneath a military operations area, and a clear line of sight to the west. AR177871, 177876, 205705. There are also factors that make other locations "unreasonable," including scheduling conflicts, limited range time, lack of proximity to existing bases, and cost.

1 AR205705. However, these criteria are never applied to explain why private land within the
2 Olympic Military Operations Areas would not suit the Navy's needs. Instead, the Navy's
3 Environmental Assessment and permit application use the criteria only to explain why national
4 forest land is ideal for electronic warfare training, AR177871, and why Department of Defense
5 locations are untenable, AR205705. This has little to do with private land.

   The Forest Service identifies only one place in the administrative record where private
7 land is actually depicted. Appendix A to the Forest Service's Decision contains seven pages of
8 maps depicting the Navy's "Proposed Mobile Emitter Sites" and their surroundings. AR205609-
9 16. However, these maps contain no analysis based on the criteria mentioned by the Forest
10 Service. The legend identifies "other land, including private" with the color white, but the maps
11 contain no details regarding the topography of private land. AR205609-16. The legend also only
12 identifies "Forest Service existing roads" and seemingly does not label other roads. AR205609-
13 16. Consequently, despite showing that a fair amount of private land does exist within the
14 Olympic Military Operations Areas, these maps shed little no light on whether it could
15 reasonably accommodate the Navy's needs. AR205610-11.

    Furthermore, even if the Forest Service's expertise allows it to somehow use these maps
17 to rule out private land, this would be inadequate to satisfy the NFMA. The agency must "set
18 forth [the basis of its decision] with such clarity as to be understandable," rather than forcing the
19 court to "guess at the theory underlying the agency's action." *Native Ecosystems*, 418 F.3d at
20 953, 963 (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947), and finding that the
21 Forest Service violated the NFMA by failing to explain in the record how it applied one of the
22 standards from the forest plan). The Forest Service cannot now rely on post hoc rationalizations
23 that are not supported by the record. *See Ctr. for Biological Diversity v. U.S. Bureau of Land*

1 *Mgmt.*, 698 F.3d 1101, 1124 (9th Cir. 2012) ("We cannot gloss over the absence of a cogent explanation by the agency by relying on the post hoc rationalizations.").

The Forest Service also suggests that private land is not feasible because the Navy is required to "evaluate other Department of Defense locations, other federal lands, [and] other government lands before it can acquire an interest in land with a private entity." [Def.'s Mot. For Summ. Judg., Dkt. # 23, at 17]; AR205704. However, this requirement is only a barrier to using private land if the Navy can accommodate its use on government land. It follows that, if the Forest Service denied the Navy's application and there were no other public options, the Navy's policy would no longer limit its ability to consider private land. Furthermore, if the Navy does follow this policy, this would directly contradict the Forest Service's statement that the Navy determined its training "cannot be accommodated on private lands." *See* AR205599. The Navy could not have made such a determination if it had to exhaust government options first.

In short, the Forest Service committed an error by failing to provide any reason for why the Navy's training could not be accommodated on private land, as required by the Forest Plan. Nonetheless, the rationale behind the Navy's policy of preferring government land seems compelling. Dealing with multiple private entities in order to lease or purchase land to conduct electronic warfare training would likely be costly for the Navy and invasive for the private parties. Indeed, even if suitable private land does exist, it strikes the Court as unlikely that such an option would be reasonable.

In light of this, the Court grants the Forest Service's request for further briefing on the issue of harmless error. The harmless error doctrine may be employed in the administrative context "only when a mistake of the administrative body is one that clearly had no bearing on the procedure used or the substance of decision reached." *Nat. Res. Def. Council v. U.S. Forest*

1 *Serv.*, 421 F.3d 797, 807 (9th Cir. 2005). Despite this relatively high bar, the doctrine may apply here, and therefore it should be addressed before summary judgment is granted.

3. *The Forest Service's Prioritization of the Public Interest*

In addition to requiring consideration of private land, the Forest Plan also requires that the "interests and needs of the general public shall be given priority over those of the applicant." AR022641. FSEEE argues that allowing the Navy to limit the public's access to the area around the training sites subordinates recreational uses. Furthermore, FSEEE asserts that the 24-hour, nearly year-round access granted to the Navy will cause frequent conflicts with the public's use of the forests. AR205700.

The Forest Service responds that FSEEE overstates the impact of the training activities. The Forest Service points out that only three vehicles may operate in the national forest at one time and they must use existing pull-off sites. AR205579. In addition, the Forest Service asserts that the Navy is required to use a different location if a camper is occupying the mobile emitter site, and if other recreational activities are ongoing the Navy must relocate if the public user wishes. AR205703.

The Court finds that the Navy's special use permit does not violate the Forest Plan's requirement to prioritize the general public. As the Forest Service stated, the Navy's operating procedures clearly require mobile emitter trucks to leave the area if public users would prefer. AR205703. Although the procedures do not state that a truck must vacate the area if a public user arrives after operations have begun, this is not necessary to satisfy the Forest Plan's requirements as interpreted by the Forest Service. *Weldon*, 697 F.3d at 1056 (stating that the agency's interpretation is entitled to "substantial deference"). Consequently, the Forest Service did not subordinate the public interest and did not violate the NFMA.

1. *4.     The Forest Service's Consideration of the Surrounding Landscape*

Finally, the Forest Plan also requires that the use be "compatible, and in harmony with, the surrounding landscape." AR022641. FSEEE argues that the Forest Service failed altogether to address this requirement, and further contends that the mobile emitter vehicles are not in harmony with their forested surroundings.

The Forest Service once again counters that it did consider effects on the surrounding area, even if it did not use the magic words from the Forest Plan. The Decision Notice states that the eleven mobile emitter sites are all located along existing roads and will not alter the visual character of the area. AR205590-91. The Decision Notice also determined there would be no significant impact on the public, vegetation, and wildlife. AR205586-96.

The Court determines that the Forest Service did consider whether the electronic warfare training would be compatible and in harmony with the surroundings. This requirement is not very specific, and the Forest Service has the discretion to interpret it reasonably. Here, the Forest Service decided that it required considering such things as whether the training would physically alter the land, AR205591, whether it would interfere with park land or other designated areas, AR205591, and whether it would adversely affect surrounding flora and fauna, AR205588-90. This was a reasonable interpretation of the Forest Plan's requirement, and as a result the Forest Service did not violate the NFMA.

## CONCLUSION

FSEEE's and the Forest Service's Motions for Summary Judgment as to the NFMA claim related to private land are hereby reserved, pending further briefing. Because the burden of proving harmless error falls on the agency, *see Natural Resources Defense Council*, 421 F.3d at 807, the Forest Service is GRANTED fourteen days from the date of this order to supplement the

Motion for Summary Judgment. FSEEE is GRANTED fourteen days to respond and the Forest Service is GRANTED ten days to reply to any new issues or evidence raised in the response. FSEEE's Motion for Summary Judgment is DENIED and the Forest Service's Motion is GRANTED as to all other claims.

IT IS SO ORDERED.

Dated this 18th day of September, 2018.

*Ronald B. Leighton*
Ronald B. Leighton
United States District Judge